

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 03 C 7172 |
| | ) | |
| THE COUNTY OF COOK; MICHAEL | ) | |
| SHEAHAN, Sheriff of Cook County, in his | ) | |
| official capacity; CALLIE BAIRD, Director, | ) | |
| Cook County Department of Corrections, | ) | |
| in her official capacity; RUTH ROTHSTEIN, | ) | |
| Director, Cook County Department of Public | ) | |
| Health, in her official capacity; and | ) | |
| LEONARD R. BERSKY, Chief Operating | ) | |
| Officer, Cermak Health Services of Cook | ) | |
| County, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this lawsuit, Lawrence Thompson, an attorney proceeding *pro se,* contends that upon

being incarcerated after being found in civil contempt by a Cook County judge, he was forced by

Cook County personnel to submit to a visual cavity strip search, and to undergo a urethral

swabbing test which involved insertion of a metal rod with a swab on the end into his penis.

Thompson claims that these procedures violated his Fourth Amendment, Eighth Amendment,

and Fourteenth Amendment rights. The defendants have moved for summary judgment. For the

reasons outlined below, the Court denies the defendants' motion.

1

**Facts**

On October 9, 2002, a Circuit Court of Cook County judge found Thompson in civil contempt when he refused to sign certain documents related to his pending divorce proceedings and ordered him held in custody until he signed the documents. *See* Pl's Ex. B. A Cook County Sheriff's deputy took Thompson into custody and searched him at the courthouse. Thompson was later transported to the Cook County Jail. Upon his arrival at the jail, Thompson was processed along with approximately 250 other new inmates. It is likely that most, if not all, of the others were pretrial detainees, that is, persons charged with crimes awaiting trial.

After spending some time in a holding pen, Thompson and the others were given identification cards and were photographed. Thompson was then interviewed by a Cermak Health Services employee, who asked him medical screening questions. The defendants maintain that during this interview, Thompson responded to questions on a standard form concerning his medical history and current problems and signed the following "consent for treatment" portion of the form:

> I consent to a medical and mental health history and physical including screening
> for tuberculosis and sexually transmitted diseases as part of the intake process of
> the Cook County Jail. I also consent to ongoing medical treatment by Cermak
> Health Services staff for problems identified during this process. I understand I
> may be asked to sign forms allowing other medical treatments. I understand that
> every effort will be made by CHS staff to keep my medical problems confidential.
> I understand the policy of CHS regarding access to heath care at Cook County
> Jail.

Thompson Dep. Ex. 1. Thompson acknowledges that the medical intake form produced by the defendants accurately reflects his medical history and current conditions. Though he has no independent recollection of the exact questions he was asked, he testified that the questions on

2

the form appear to be the type of questions he was asked during intake. He likewise agrees that the signature on the medical intake form looks like his signature. Thompson denies, however, that it is his signature and says he had never seen the medical intake form before it was produced during discovery in this matter.

The defendants claim that during the interview, Charles Kinnerk, the employee they say conducted the interview,[1] informed Thompson of his right to refuse the medical screening. Kinnerk testified that he believed the medical intake form informed inmates of their right to refuse consent and that he informs inmates of the existence of a refusal to consent form. Kinnerk Dep. at 22-23. According to Kinnerk, if an inmate refuses to consent, he notes "patient refused" on the signature line, and the inmate fills out a refusal of medical treatment form. *Id.* at 12, 52. Thompson denies that anyone ever informed him of his right to refuse consent.

Following this brief interview, Thompson's personal property was inventoried. Next, he and the inmates underwent a urethral swabbing procedure. According to Thompson, a man who was smoking a cigarette and referred to himself as the "dick doctor" addressed the group, making various threats, such as "you don't want to piss-off the dick doctor." Thompson Supp. Aff. ¶ 14. The inmates, who were in a single file line, went into the room one at a time for the procedure. The prisoner next in line waited at the threshold of the open door while the test was administered to the prisoner in front of him. Thompson testified that when it was his turn, the individual performing the procedure directed him to take out his penis and hang it over a garbage can, and then inserted a metal rod into his urethra. He claims he felt pain both during and after the

---

[1] Thompson denies that Kinnerk conducted the interview. He says the person who interviewed him was African-American. Kinnerk is Caucasian.

3

procedure.

The defendants assert that in 2002, it was the policy of Cermak Health Services, in conjunction with the Cook County Department of Health and the City of Chicago Department of Health, to conduct urethral swabbing on male detainees entering Cook County Jail to screen for syphilis and chlamydia. The defendants aver that this joint project was developed for purposes of promoting the health of inmates even after they are discharged from the Department of Corrections. Dr. John Raba, the Chief Operating Officer of Cermak Health Services, testified that the test involves inserting a thin swab a short distance into the urethra and gently rotating it to collect any organisms or inflammatory cells. Raba Aff. ¶ 3. Dr. Raba described this as a minimally invasive medical procedure that is very safe and rarely causes even minimal injury to the human body. *Id.* However, he acknowledged that the procedure may cause some discomfort during and for a short time after the test. *Id.*

Dr. Raba also stated that it was the policy of Cermak Health Services to obtain medical consent for the procedure in the form of the medical intake forms. *Id.* at ¶ 5. Though the defendants did not produce any completed refusal to consent forms, they maintain that fewer than ten inmates a year refuse the urethral swabbing procedure. Def's 56.1 Stmt. ¶ 28. Thompson acknowledges that he did not verbally refuse to undergo the procedure. But he contends that prior to the urethral swabbing procedure, he was unaware of what medical tests would be performed as part of the intake process and thus could not have provided informed consent. The defendants claim that there is a sign in the room where the urethral swabbing procedure occurs that describes the procedure. *See* Kinnerk Dep. at 13-14.

After the urethral swabbing, Thompson and the other inmates received a chest x-ray and

4

had blood drawn. Though Thompson maintains that he did not consent to these procedures, they do not form part of his complaint in this case.

Finally, the inmates were escorted into a receiving tunnel – a hallway that is approximately ten feet wide and 100 yards long – in groups of forty to fifty at a time. The parties appear to be in agreement concerning the details of the subsequent strip/visual body cavity search.[2] Thompson and the others were lined up on both sides of the hallway with their backs against the wall and ordered by Department of Corrections officers to take off all their clothes and place them on the ground in front of them. As a number of officers watched, Thompson and the others were told to face the wall, reach high up on the wall, and run their fingers through their hair. They were then instructed to bend over and spread their buttocks – a position they had to maintain until an officer was able to observe each inmate. Thompson Dep. at 57-58. No prisoners were physically touched during this process. After being ordered to hold up each item of clothing for inspection, the inmates were allowed to get dressed.

Thompson contends that the visual cavity search violated the Fourth Amendment's prohibition against unreasonable searches. He also maintains that because he did not consent to the urethral swabbing, the defendants subjected him to that test in violation of his Fourth Amendment rights, his due process right to be free from unjustified intrusions into his body and

---

[2] The parties disagree on the relevant terminology. Defendants maintain that inmates are strip searched as part of intake procedure, but that they do not receive a cavity search, which defendants say involve touching. Courts, however, distinguish between visual cavity searches, which involve visually inspecting body cavities, and the more invasive procedure, sometimes referred to as a digital cavity search, that involves touching or physically searching an individual's body cavities. *See Thompson v. Souza*, 111 F.3d 694, 700-701 (9th Cir. 1997); *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1274 (7th Cir. 1983) (referring to similar procedure as "visual cavity search"). As the parties agree that no touching was involved, we will refer to the intake procedure as a visual cavity search.

5

to refuse unwanted medical treatment, and the Eighth Amendment's prohibition against cruel and unusual punishment.

Thompson sues Cook County and four Cook County administrators in their official capacities. The defendants are Michael Sheehan, the Sheriff of Cook County; Callie Baird, the Director of the Cook County Department of Corrections; Ruth Rothstein, the Director of the Cook County Department of Public Health; and Leonard Bersky, the Chief Operating Officer of Cermak Health Services.

## Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts and draw all reasonable and justifiable inferences in favor of Thompson, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The defendants' motion presents two issues for consideration: first, whether Thompson has brought suit against the appropriate defendants, and second, whether the defendants are entitled to judgment as a matter of law on the merits of Thompson's claims.

## 1. The named defendants' liability

The defendants contend that Thompson has failed to show personal involvement by any of the defendants in the alleged constitutional deprivations and thus may not prevail in a § 1983 claim against any of the individuals named. The defendants correctly point out that the doctrine

6

of *respondeat superior* cannot be used to hold a supervisor liable for a subordinate's violation of plaintiff's constitutional rights. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Thompson, however, has not sued the defendants in their individual capacities. Instead, he seeks to hold each defendant liable in his or her official capacity. Official capacity suits are, "in all respects other than name, to be treated as a suit against the entity . . . . for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). A governmental entity is subject to § 1983 liability only if a policy or custom of the entity caused the constitutional deprivation. *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978).

The record does not reflect the existence of a written policy requiring incoming detainees, including those imprisoned for contempt, to undergo a visual cavity search as part of the intake process. But the defendants admit that a security strip search was conducted on all incoming detainees and prisoners at the Cook County Jail. Def's 56.1 Resp. ¶ 1. Similarly, Daniel Brown, Superintendent of the Cook County Department of Corrections, testified that all inmates going through intake receive the same type of search. Brown Dep. at 32. Moreover, each side appears to agree on the scope of the search conducted. Accordingly, there is sufficient evidence to permit Thompson to proceed on his official capacity claims regarding the visual cavity search; the defendants are not entitled to summary judgment on this ground.

With respect to the urethral swabbing procedure, it is not cyrstal clear that a policy existed in October 2002 mandating urethral swabbing for all males entering the Cook County Jail. Cermak Health Services Policy No. 01-08B-01, effective January 2000, states that "Screening for sexually transmitted diseases (STD) *is available upon* incarceration." Cermak Health Services, Infection Control Program, Policy No. 01-08B-01 (emphasis added). The

7

defendants also produced a March 2003 version of a written policy titled "Sexually Transmitted Disease Program" which provides that "All individuals entering CCDOC will be screened for sexually transmitted diseases. The procedure for testing is to be explained to each individual undergoing testing." Cermak Health Services, Sexually Transmitted Disease Program, Policy No. 01-08E-41. One of the procedures listed in this policy is urethral swabbing. Though the version of the policy produced by the defendants was a revision that post-dates Thompson's processing, it lists the policy's date of origin as July 1984. Though the defendants have not supplied the Court with the version of this policy in place at the time of Thompson's incarceration, for present purposes we believe it reasonable to infer that a similar policy existed at that time. And even were this not the case, the circumstances surrounding Thompson's own processing permit a reasonable inference that the Cook County personnel were acting pursuant to an established policy with regard to the urethral swabbing.

Thompson claims that the swabbing was conducted without his knowing or voluntary consent. As indicated earlier, Dr. Raba testified that Cermak Health Services' policy was to obtain consent from new inmates via the medical intake form. Raba Aff. ¶ 5. The consent portion of this form, however, does not mention that what it calls "screening" for sexually transmitted diseases would include an invasive test. The defendants also contend that a sign in the room where the swabbing procedure occurred provided inmates with information about the procedure. However, none of the signs produced by the defendants provide any such information. Pl's Supp. Aff. Ex. D. In any event, inmates would not have had access to this sign until they were actually in the room awaiting the procedure, after they had already signed the consent form. In addition, Charles Kinnerk testified that if Cermak Health Services is short-

8

staffed, inmates sometimes undergo the urethral swabbing before signing the consent form. Kinnerk Dep. at 37.

Given all the circumstances, a jury reasonably could find that the County had an established custom or practice of conducting urethral swabbing tests on detainees without obtaining voluntary consent. As with the visual body cavity scan, there is sufficient evidence for Thompson to pursue an official capacity claim against the defendants regarding the claim of unconsented urethral swabbing.

## 2. The applicable constitutional provisions

Thompson asserts claims under the Fourth, Eighth, and Fourteenth Amendments. The Eighth Amendment's prohibition on cruel and unusual punishment applies only to prisoners incarcerated after an adjudication of guilt regarding a criminal offense. *See Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979). Persons convicted of a crime, including those found in criminal contempt, may be punished by the state, *id.* at 535 n.16 & 535 n.17, so long as the punishment has some penological justification and does not amount to the gratuitous infliction of physical or psychological suffering. *See Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see also, e.g., Calhoun v. DeTella,* 319 F.3d 936, 939 (7th Cir.2003).

Because he was not a convicted prisoner, Thompson cannot maintain an Eighth Amendment claim. But that does not impair in the least his chances of success in this action. Detainees who have not been convicted of a crime are entitled to greater protection than convicted prisoners, not less. *See, e.g., Hart v. Sheahan,* 396 F.3d 887, 891 (7th Cir. 2005); *Board v. Farnham,* 394 F.3d 496, 477 (7th Cir. 2005). Specifically, a pretrial detainee enjoys the protections of the Due Process Clause of the Fourteenth Amendment and may not be punished at

9

all (except for infractions committed while in custody). *See, e.g., Bell,* 441 U.S. at 535; *Hart,* 396 F.3d at 893; *Board,* 394 F.3d at 477; *Tesch v. County of Green Lake,* 157 F.3d 465, 473 (7th Cir. 1998). Thus if a particular condition of pretrial detention amounts to punishment, it is unconstitutional.

Thompson was held in civil contempt; he was not convicted of any sort of a crime. Though he cannot complain that his imprisonment for civil contempt was an act of punishment, *see, e.g., Ingraham v. Wright,* 430 U.S. 651, 667-68 (1977); *Rodriguez v. Briley,* 403 F.3d 952, 953 (7th Cir. 2005), that does not mean that he could be subjected to detention conditions that were punitive in nature. Thompson was incarcerated not to be punished, but so that he might be induced to comply with the state court judge's directive. The Court sees no basis to assess his treatment by a more relaxed standard than one that applies to pretrial detainees.

Given these considerations, if Thompson could show that the particular practices he challenges were punitive in nature, he would prevail. But although Thompson might be able to sustain an individual-capacity claim against the individual who actually administered the urethral swabbing procedure to him – the self-described "dick doctor" – he has not made any claims against any of the defendants in their individual capacities. Looking at the policies he challenges in his official-capacity claims against the defendants, the Court sees no evidence that would support a claim that the County's practices constituted punishment. To prove that a particular condition or practice was punitive, Thompson must establish both that the practice was objectively punitive and that the responsible officials acted with a culpable mental state. *See Tesch,* 157 F.3d at 473. If a particular condition or practice is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment; conversely, if the

10

practice is arbitrary or purposeless, a court may infer that it is punitive. *Id.* at 474 (citing

*Bell,* 441 U.S. at 539). Thompson has no evidence that the County acted with deliberate

indifference, the mental state required to sustain a claim of improperly punitive conditions. *See*

*id.* at 475 & n.3 (citing *Wilson v. Seiter,* 501 U.S. 294, 303 (1991)); *see also, Board,* 394 F.3d at

478.

 In *Hart,* the Seventh Circuit suggested that proof of a punitive purpose ought not be

necessary to establish a claim under the Due Process Clause that a particular condition of pretrial

detention is punitive. *Hart,* 396 F.3d at 891-82. It proposed a standard under which a

gratuitously harsh or severe condition would be considered punitive even in the absence of proof

of punitive intent. *Id.* at 892-93. Assuming that is the appropriate standard, Thompson still fails

to provide evidence from which one reasonable could infer that the practices he challenges were

punitive. There is no question that the urethral swab procedure produces pain or at least

discomfort, as well as, perhaps, embarrassment, and that the visual body cavity inspection is

likewise intrusive and embarrassing. But calling these practices gratuitously harsh or severe and

therefore punitive is too big a stretch.

 Thompson's case, however, does not rise or fall on the question of whether the

procedures he challenges were punitive. He also challenges both the urethral swab testing and

the body cavity inspection as violative of the Fourth Amendment and also attacks the former

procedure as contrary to his right under the Due Process Clause to refuse unwanted medical

treatment. We turn next to those challenges.

**3. The visual body cavity search**

 We begin with the body cavity inspection. What is presented for the Court's review in

11

this case is the propriety of blanket body cavity inspections of all incoming detainees at the jail, without reasonable suspicion that they might be concealing contraband, and no matter what they are charged with – a felony of any type, a misdemeanor, or, like Thompson, civil contempt. The defendants make no claim, and offer no evidence, of any basis to believe that Thompson could have been concealing contraband. Nor have they offered evidence that civil contemnors as a group are at all likely to be concealing contraband on their persons.

Both pretrial detainees and convicted prisoners – and thus, by analogy, civil contemnors – retain constitutional rights, including the Fourth Amendment's protection against unreasonable searches and seizures. *Bell,* 441 U.S. at 545. Those rights, however, are subject to limitations based on the fact of confinement, the legitimate goals of the penal institution, and the institution's need to maintain security and order. *Id.* at 545-46. An institutional practice claimed to infringe a constitutional guarantee must be evaluated in light of the central objective of jail administration, that is, keeping the institution secure. *Id.* at 546. Courts must make this evaluation deferentially, giving due regard to the professional expertise of correctional officials. *Id.* at 548.

In *Bell,* the Supreme Court considered the propriety of body cavity searches of pretrial detainees as well as convicted prisoners under a Fourth Amendment standard, though it appeared to assume, rather than decide, that this was the proper standard. *Id.* at 558. Several years after the Supreme Court decided *Bell,* it held that a prison inmate lacks a reasonable expectation of privacy in his prison cell and thus cannot sustain a Fourth Amendment claim regarding a search of his cell. *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). But *Hudson* did not disturb *Bell's* application of the Fourth Amendment to searches of a detainee's or inmate's person, and

12

courts have continued to apply the Fourth Amendment when assessing the propriety of strip searches and body cavity searches of arrestees, pretrial detainees, and convicted prisoners. *See, e.g., Savard v. Rhode Island,* 338 F.2d 23, 28-30 (1st Cir. 2003) (arrestee); *Shain v. Ellison,* 273 F.3d 56, 63-64 (2d Cir. 2001) (pretrial detainee); *Wilson v. Jones,* 251 F.3d 1340, 1342-43 (11th Cir. 2001) (arrestee); *Roberts v. Rhode Island,* 239 F.3d 107, 110 (1st Cir. 2001) (pretrial detainee); *Peckham v. Wisconsin Dep't of Corrections,* 141 F.3d 694, 697 (7th Cir. 1998) (convicted prisoner); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 712-13 (9th Cir. 1989) (arrestee). *Cf. Del Raine v. Williford,* 32 F.3d 1024, 1039 n.5 (7th Cir. 1994) (convicted prisoner; holding appellant had waived Fourth Amendment challenge, but citing other cases applying Fourth Amendment).

The Fourth Amendment prohibits unreasonable searches, a standard "not capable of precise definition or mechanical application." *Bell,* 441 U.S. at 559. A court considers the scope of the intrusion, the manner in which it was conducted, the justification for the intrusion, and the place where it was conducted. *Id.*

It is beyond argument that the search involved is extremely intrusive. As the Seventh Circuit stated in a case involving misdemeanor arrestees, "we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual and anal genital searches practiced here." *Mary Beth G. v. City of Chicago,* 723 F.2d 1262, 1272 (7th Cir. 1983). And rather than being conducted in private – as was the case in *Mary Beth G.* – Thompson was searched in full view of dozens of other detainees, not to mention a significant number of jail guards.

The real issue in this case, however, concerns the justification for the visual cavity search.

13

The defendants contend that the routine visual cavity search is required to prevent inmates from smuggling contraband – weapons, drugs, and so on – into the jail. Maintaining institutional security is "perhaps the most legitimate of penological goals." *Overton v. Bazzetta,* 539 U.S. 126, 133 (2003). As we have indicated, the determinations of correctional officials in this regard are entitled to deference, absent evidence they have overreacted to concerns inherent in the prison or jail context. *See Bell,* 441 U.S. at 540; *see also, Stanley v. Henson,* 337 F.3d 961, 966 (7th Cir. 2003). But this does not immunize jail officials' decisions from scrutiny. *Stanley,* 337 F.3d at 966. Officials do not have *carte blanche* to institute any policy they please under the justification of institutional security. "An indiscriminate strip search policy routinely applied ... [cannot] be justified simply on the basis of administrative ease in attending to security considerations." *Roberts,* 239 F.3d at 113 (ellipsis in original; quoting *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir. 1981)).

As Thompson argues, defendants have failed to provide any evidence supporting the need to conduct body cavity searches on all new detainees, much less on those like Thompson imprisoned for civil contempt. The only evidence offered by defendants consists of the following unexplained statement by superintendent Brown at his deposition:

> We have, yes, in the jail, where detainees have hidden homemade knives. I can't think of a specific instance where I could go back and – you know, but I do know that personally being the case, that that has – when they try to – detainees will try to smuggle things in. A lighter, for instance, which could be considered a weapon, definitely I've seen that in the receiving room. I've seen – you know, you asked about weapons.

Brown Dep. at 20-21. As Thompson suggests, it is unclear whether this testimony concerns items found on newly-arriving detainees, as opposed to detainees who were already at the jail.

14

Without more, this evidence – the only evidence defendants point to as justifying their blanket cavity search policy – is insufficient to entitle them to summary judgment.

In *Bell,* the Supreme Court upheld a detention facility's policy of conducting a strip search, including a visual inspection of body cavities, of both sentenced prisoners and pretrial detainees, after every contact visit with a person from outside the institution. *Bell,* 441 U.S. at 558-60. But unlike the inmates in *Bell,* Thompson and the other detainees in this case were not being searched following contact with outsiders. Rather, they were subject to an "intake" search following their arrest by law enforcement officials. "Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something." *Shain,* 273 F.3d at 63. And it is a relatively safe assumption – at least in the absence of evidence to the contrary – that only a negligible portion of arrestees have concealed contraband in body cavities *prior to* their encounter with law enforcement.

Defendants have cited no cases that *per se* validate blanket strip searches for non-felony detainees in detention centers. In fact, courts have generally held that persons detained for minor offenses not involving weapons or drugs may not be subjected to a strip search or visual cavity search absent reasonable suspicion that the particular arrestee or detainee is concealing such items. *Roberts,* 239 F.3d at 112; *Shain,* 273 F.3d at 62-66; *Wilson,* 251 F.3d at 1343; *Miller v. Kennebec County,* 219 F.3d 8, 12 (1st Cir. 2000); *Kelly v. Fosi,* 77 F.3d 819, 821-22 (5th Cir. 1996); *Swain v. Spinney,* 117 F.3d 1, 7 (1st Cir. 1997); *Kennedy,* 902 F.2d at 712-13; *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir. 1986); *Stewart v. Lubbock County,* 767 F.2d 153, 156 (5th Cir. 1985); *Giles v. Ackerman,* 746 F.2d 614, 615 (9th Cir. 1984); *Mary Beth G.,* 723 F.2d at 1273. In *Roberts,* the First Circuit indicated that searching all inmates is more reasonable in cases in

15

which the record reflects a history of problems with prisoners smuggling items into the institution. *Roberts,* 239 F.3d at 112. But as indicated earlier, the defendants have offered only scant evidence that Cook County Jail has such a history – certainly insufficient evidence to entitle them to summary judgment. In short, genuine issues of material fact exist precluding entry of summary judgment on Thompson's claim regarding the visual body cavity search.

**4.     The urethral swabbing**

We deal next with the urethral swab test. The first question is what provision of the Constitution supplies the standard by which the Court assesses the propriety of the test. Thompson relies on the Fourth, Eighth, and Fourteenth Amendments, but as the Court has already ruled, the Eighth Amendment does not apply.

In *Schmerber v. California,* 384 U.S. 757, 768-72 (1964), the Court used the Fourth Amendment to determine the propriety of imposing an invasive medical procedure on an arrestee – in that case, the drawing of blood. Similarly, in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616 (1989), the Court concluded that a compelled drawing and testing of blood, administration of a Breathalyzer test, "which generally requires the production of alveolar or 'deep lung' breath," and collection and testing of urine, each constituted a search subject to the Fourth Amendment. These cases indicate that the administration of the urethral swabbing is properly analyzed under the Fourth Amendment.

Consent may justify a search under the Fourth Amendment, so long as it is "freely and voluntarily given." *Schneckloth v. Bustamante,* 412 U.S. 218, 219 (1973); *see also, e.g., United States v. Watson,* 423 U.S. 411, 423 (1976). The defendants argue that Thompson consented to the search by signing the medical intake form. As noted earlier, Thompson denies signing the

16

form. But even if Thompson had admitted signing the form, the defendants would not be entitled to summary judgment on this point. The consent form merely advises that the detainee will be screened for sexually transmitted diseases. It says nothing about the testing procedures or bodily intrusions involved. It is difficult to see how a form that does not even mention that a search will occur can be deemed to constitute consent for a search. The defendants are not entitled to summary judgment on this ground.

Under the Fourth Amendment, the permissibility of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (quoting *Deleware v. Prouse,* 440 U.S. 648, 654 (1979)). In the context of a criminal case or a search for evidence, the balance generally tilts in favor of the procedures described in the Fourth Amendment's Warrant Clause. *Id.* But searches that, like this one, are conducted for purposes other than to gather evidence are analyzed under the so-called "special needs" standard. *Id.* (citing cases). Under this standard, effectively the same one articulated in *Bell,* courts consider the nature of the privacy interest at stake, the character of the intrusion, and the nature of the government's interest and the efficacy of its practice in meeting that interest. *See, e.g., Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls,* 536 U.S. 830-32 (2002).

The parties also seem to agree that the urethral swab test should be analyzed under the standards that apply to administration of unwanted medical procedures. Indeed, the defendants seek to justify the test on the ground that it advances the institution's interest in protecting the health of inmates. An inmate has an interest, protected by the Due Process Clause of the Fourteenth Amendment, in refusing unwanted medical treatment. *See Cruzan v. Director,*

17

*Missouri Dep't of Health,* 497 U.S. 261, 278-79 (1990); *Washington v. Harper,* 494 U.S. 210, 221-22 (1990).[3] A regulation that impinges on this interest is valid if it is reasonably related to legitimate penological interests. *Russell v. Richards,* 384 F.3d 444, 447 (7th Cir. 2004) (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The factors to be considered include whether there is a valid and rational connection between the regulation and the governmental interest put forward to justify it; the impact that accommodation of the inmate's right would have on guards, other inmates, and jail resources; and whether there is a ready alternative that would fully accommodate the prisoner's right to refuse treatment at a minimal cost to valid penological interests. *Id.* at 447-49.

Though the Fourth Amendment and due process standards are not identical, there is sufficient overlap to permit the Court to discuss the relevant factors together.

First of all, for Fourth Amendment purposes, the privacy interest at stake is significant, and the intrusion involved cannot fairly be described as minimal. In *Skinner,* the Court, though noting that the collection of urine was not an invasive procedure, expressed reluctance to "characterize ... as minimal" the privacy concerns arising from the intimacy of the bodily function involved in the intrusion, and relied on the existence of regulations that "endeavor[ed] to reduce the intrusiveness of the collection process," including the absence of observation and conduct of the procedure in a medical environment by independent personnel. *Skinner,* 489 U.S. at 626. The urethral swabbing procedure, by contrast, involves invasion of one of the most

---

[3] *Cruzan* and *Harper* involved convicted prisoners, but pretrial detainees – and thus presumably civil contemnors – have at least those rights guaranteed to convicted prisoners. *See Russell v. Richards,* 384 F.3d 444, 447 n.1 (7th Cir. 2004) (citing *Riggins v. Nevada,* 504 U.S. 127, 135 (1992)).

18

intimate and sensitive parts of the male body, and the evidence submitted by the parties suggests that the procedures used may exacerbate, rather than reduce, the procedure's inherent intrusiveness. As a result, the Court can only conclude that the intrusion involved is a significant one that is not mitigated by the processes adopted by the defendants.

Assessment of the governmental interest involved and the "fit" between that interest and the procedure at issue is an aspect of both the Fourth Amendment and due process standards. Though the due process standard requires a rational fit, as opposed to a perfect fit, between Cook County's legitimate interests and the policy in question, there must still exist a logical connection between the urethral swabbing and the interests defendants offer as justification. *See Russell,* 384 F.3d at 448.

The defendants claim that their STD testing is conducted "for purposes of promoting health of inmates even after they are discharged from the Cook County Department of Corrections." Defs' 56.1 Stmt. ¶ 16. They also contend that "Cermak Health Services is concerned about the maintenance and improvement of the health of its inmate population, especially since the medical screening is in some instances the only medical care many inmates have received." *Id.* at ¶ 49. Noticeably absent from this seemingly benevolent purpose is any indication that the defendants developed this policy to eradicate an existing problem with sexually transmitted diseases (STDs) in the Cook County Jail.

The defendants cite national studies affirming that STDs continue to be a major health threat in the United States and provide evidence that "multiple studies and surveillance projects have demonstrated a high prevalence of STDs in persons entering jails and correctional facilities." Raba Aff. ¶ 15. But they have provided no evidence that the Cook County Jail has

19

experienced similar problems. Jean Kiriazes, the director of continuous quality improvement and

risk management at Cermak Health Services, who says she is the person in the best position to

answer questions related to the intake policies, *see* Kiriazes Dep. at 5, was unaware of venereal

diseases having ever been spread in the Cook County Jail. *Id.* at 29. Similarly, jail

superintendent Brown testified that he is unaware of any sexually transmitted disease having

been spread in the facility and that nobody has ever expressed a concern to him along these lines.

Brown Dep. at 37-38.

Perhaps more importantly, the defendants have provided no evidence that their program is

geared toward curbing the spread of STDs or eliminating such infections in inmates. The

laboratory reports do not differentiate among inmates who test negative and those who refused to

consent to the urethral swabbing – a distinction that would seem important if the goal were to

prevent the spread of STDs in the jail. *See* Wicheanvonagoon Aff. ¶ 9. The defendants have also

provided no description of the course of action they take if a prisoner tests positive for an STD,

such as segregating that prisoner from non-infected inmates until he is treated. The defendants'

key personnel do not even seem to know how long it takes to obtain results from the urethral

swabbing and whether results are obtained during the relatively short average stay of a detainee

(according to Kiriazes, between fourteen and twenty-one days). *See* Kiriazes Dep. at 29; Brown

Dep. at 44. In addition, superintendent Brown was unaware of any inmate who has ever been

treated for a venereal disease based on the results of the screening. Brown Dep. at 88. On the

present record, the connection between the defendants' justifications and the challenged policy is

too tenuous to entitle the defendants to summary judgment.

Furthermore, this case concerns an invasive and uncomfortable procedure that is carried

20

out not in a private setting, but rather under the watchful eyes of at least one other detainee who has a view from the open doorway. Even considering the jail setting, this is a significant intrusion on privacy. And there may be an available alternative that would be far less invasive and might actually reduce the jail's expenses. Dr. Raba testified that the estimated cost of a urine collection technique is the same or slightly less than the cost of the urethral swabbing. *Id.* He opined, however, that urine screening would be logistically unfeasible in the intake facility as it now exists – only one toilet is allegedly available – and that some inmates might, due to anxiety, be unable to produce a sample. The record as it now stands does not permit the Court to assess adequately the effectiveness of an alternative procedure.

Finally, as part of the due process analysis, the Court considers the effect that barring unconsented urethral swabbing would have on other prisoners and the staff. There is no question that a jail has a duty to ensure the safety and well-being of its inmates and staff. *See Russell*, 384 F.3d at 448. But as indicated earlier, the defendants have provided no evidence that it uses the policy to carry out that duty. On the present record, one cannot find that prisoners or jail staff would be detrimentally affected if this procedure were eliminated. *Cf. id.* at 448-49 ("The fact that the jail has endured a number of lice outbreaks in the past demonstrates that this is more than an abstract possibility."). Moreover, the jail stopped conducting urethral swabbing tests during intake in May 2003 "due to reprioritization of the medical intake process." Def's 56.1 Stmt. ¶ 42. This arguably suggests that the County itself attached little importance to its use of this procedure.

In sum, there are genuine factual issues regarding whether the urethral swabbing policy violated Thompson's Fourth Amendment and Fourteenth Amendment rights, thus precluding

21

entry of summary judgment.

## Conclusion

For the reasons stated above, the Court denies defendants' motion for summary judgment [docket no. 34]. The case is set for a status hearing on August 16, 2005 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

MATTHEW F. KENNELLY
United States District Judge

Date: August 8, 2005