IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE THOMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 03 C 7172 |
| ) | |
| THE COUNTY OF COOK and MICHAEL ) | |
| SHEAHAN, Sheriff of Cook County, in his ) | |
| official capacity, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Lawrence Thompson sued Cook County and Sheriff Michael Sheahan for allegedly violating his constitutional rights while he was incarcerated in the Cook County Jail for civil contempt. He claims that jail officials subjected him to an unreasonable strip search in violation of his Fourth Amendment rights (Count 1) and performed an invasive urethral swabbing procedure without his consent in violation of his Fourth and Fourteenth Amendment rights (Counts 2 and 3). On February 7, 2006, a jury found in favor of the defendants on all counts. Thompson has moved for a new trial. For the following reasons, the Court orders a new trial on Count 1 but otherwise denies Thompson's motion.

**Facts**

On October 9, 2002, a judge of the Circuit Court of Cook County found Thompson in civil contempt and ordered him held in custody after Thompson refused to sign certain

documents related to his pending divorce proceedings.  Cook County Sheriff's deputies took Thompson into custody and transported him to the Cook County Jail along with other individuals, some of whom were already wearing jail-issued clothing.

Upon arrival at the jail, Thompson was processed along with approximately 250 other new inmates.  After spending some time in a holding pen, Thompson and the others were photographed and given identification cards.  An employee from Cermak Health Services, the agency responsible for administering medical treatment to detainees at the Cook County Jail, then asked Thompson a number of medical screening questions.  During the interview, Thompson responded to questions on a standard form concerning his medical history and signed the following "consent for treatment" portion of the form:

> I consent to a medical and mental health history and physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail.  I also consent to ongoing medical treatment by Cermak Health Services staff for problems identified during this process.  I understand I may be asked to sign forms allowing other medical treatments.  I understand that every effort will be made by CHS staff to keep my medical problems confidential.  I understand the policy of CHS regarding access to health care at Cook County Jail.

At trial, the defendants presented evidence that during the interview, a Cook County Jail employee informed Thompson of his right to refuse the medical screening.  Thompson denied that anyone informed him of his right to refuse consent.

Following the medical screening interview, Thompson's personal property was inventoried.  He and other inmates then underwent a urethral swabbing procedure.  Thompson testified that a man who referred to himself as the "dick doctor" addressed the group, making various threats, such as "you don't want to piss-off the dick doctor."  The inmates went into a room, one at a time, to undergo the procedure.  Thompson testified that when it was his turn, the

individual performing the procedure directed him to take out his penis and hang it over a garbage can and then inserted into Thompson's urethra a metal rod with a swab on the end. Thompson claims that he felt pain both during and after the procedure.

The defendants conceded that in 2002, it was the policy of Cermak Health Services, in conjunction with the Cook County Department of Health and the City of Chicago Department of Health, to conduct urethral swabbing on male detainees entering Cook County Jail to screen for syphilis and chlamydia. The defendants aver that this joint project was developed for purposes of promoting the health of inmates. Melvin Judkins, a paramedic who has worked for Cermak Health Services for seventeen years, testified that the test involves inserting a thin swab a short distance into the urethra and gently rotating it to collect any organisms or inflammatory cells.

After the urethral swabbing procedure, Department of Corrections officers escorted Thompson and other inmates into a receiving tunnel in groups of forty to fifty at a time. The officers lined them up on both sides of the hallway and ordered them to take off their clothes and place them on the ground in front of them. The officers then instructed Thompson and the others to face the wall, run their fingers through their hair, and then bend or squat and cough. After ordering the inmates to hold up each item of clothing for inspection, the officers allowed them to get dressed.

During closing argument, Thompson's attorney contended that the strip search violated the Fourth Amendment's prohibition against unreasonable searches. He also maintained that because Thompson did not consent to the urethral swabbing, the defendants violated Thompson's Fourth Amendment and due process rights to be free from unjustified intrusions into his body and to refuse unwanted medical treatment. In response, the defendants' attorney argued that

3

Thompson knew what he was doing when he signed the medical consent form and that the strip search was reasonable because defendants reasonably suspected that Thompson was concealing contraband on his person.

After a four day trial, the jury returned a verdict in the defendants' favor on all counts.

## Discussion

Federal Rule of Civil Procedure 59(a) permits a court to grant a motion for a new trial if the jury's verdict was against the clear weight of the evidence or the trial was unfair to the moving party. *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1992). Thompson makes three principal arguments in support of his motion for a new trial: a Cook County employee was erroneously allowed to remain on the jury; the defendants' attorney improperly and inaccurately referred to Thompson as a "rich lawyer" during closing argument; and the clear weight of the evidence indicated that jail officers lacked reasonable suspicion to conduct the strip search.

### 1. Failure to excuse juror for cause

At trial, one of the prospective jurors was a medical doctor who chairs the neuroanesthesiology department at Stroger Hospital, which is managed by the Cook County Bureau of Health Services, the same administrative agency that manages Cermak Health Services. Thompson challenged this juror for cause, arguing that a Cook County employee responsible for administering medical treatment would unfairly favor the defendants. The Court overruled Thompson's challenge after the juror insisted that he could be impartial, and the juror was seated after Thompson declined to use a peremptory challenge to remove him. This juror was eventually elected the jury's foreperson. Thompson argues that he was denied a fair trial

because the Court allowed the juror to remain on the jury.

The Seventh Circuit has held that district courts should excuse certain jurors who have a particularly close relationship to the litigants. *See United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000) ("A court must excuse a juror for cause if the juror is related to one of the parties in the case[] or if the juror has even a tiny financial interest in the case."). *Id.* Though such a juror may be objective in fact, the law errs on the side of caution and requires the juror's dismissal. *Id.* In *Polichemi*, the district court declined to disqualify a juror who was employed by the same United States Attorney's office that was prosecuting the case before the court. *Id.* at 705. The court of appeals said that it agreed with the United States that "government employment alone is not, and should not be, enough to trigger the [common law] rule under which an employee is disqualified from serving as a juror in a case involving her employer." *Id.* at 704. The court concluded, however, that an employee of the same prosecutor's office was too closely related to the lawsuit and should have been struck for cause. *Id.* at 705.

The Seventh Circuit has not directly considered – so far as the Court can ascertain – whether employees are prohibited from serving on juries involving their employers, notwithstanding the common law's contrary rule. The Ninth Circuit, however, has held that it is not an abuse of discretion to allow such an employee to serve. *See Nathan v. Boeing Co.*, 116 F.3d 422, 425 (9th Cir. 1997). In *Nathan*, two potential jurors were employees of the defendant corporation, but nothing else in the record indicated that they could not render impartial verdicts. The court said there was no *per se* rule prohibiting an employee of a party from serving on a jury and held that the district court did not abuse its discretion by allowing the jurors to serve.

5

As noted earlier, the juror at issue in the present case is an employee and department chair of Stroger Hospital. Stroger Hospital and Cermak Health Services, the agency whose employees performed the urethral swabbing procedure on Thompson, are both part of the Cook County Bureau of Health Services, a government agency that employs thousands of individuals. The juror stated during voir dire that he had administered anesthesia to jail inmates in the past, and he is casual friends with Ruth Rothstein, the director of the Cook County Department of Public Health, and Callie Baird, the Director of the Cook County Department of Corrections. Both Rothstein and Baird were originally parties to the lawsuit but were no longer parties at the time of trial.

Though the question is a close one, the Court concludes that it did not err by refusing to strike the juror for cause. The Seventh Circuit's comments in *Polichemi* suggest that it would not disapprove of a government employee sitting on a jury involving his or her employer. Indeed, unlike the juror who was an employee of the United States Attorney's office, the juror in this case did not work with any of the witnesses or attorneys involved in the trial. Rather, the relationship of the juror to the defendants in this case is no closer than the relationship at issue in *Nathan*, where the prospective jurors were employees of a large corporate defendant. Our juror is also casual friends with Baird and Rothstein, but neither of them were parties or witnesses in the lawsuit, and for that reason, the relationship does not suggest potential bias. *See United States v. Beasley*, 48 F.3d 262, 267 (7th Cir. 1995) (holding that trial court did not abuse its discretion by allowing juror, whose brother was Madison chief of police, to serve in case involving crime that occurred in Madison). For these reasons, the Court concludes that in light of the juror's insistence, upon careful questioning, that he could remain impartial, his relationship

with the defendants alone was not enough to indicate bias.

The two cases cited by Thompson on this issue do not support his argument. In *Crawford v. United States*, 212 U.S. 183 (1909), the Court held that a United States Post Office employee could not sit as a juror in a prosecution of an individual charged with conspiracy to defraud the post office, but that case was overruled by statute in 1935. *See United States v. Wood*, 299 U.S. 123, 132 (1936). In *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1468 (10th Cir. 1994), a potential juror's employer had a consulting contract with the defendant, and the juror had interviewed and hired a number of the defendant's former employees. *Id.* The court held that the district court did not abuse its discretion by allowing the juror to serve. *Vasey*, like *Nathan*, actually supports defendants' contention that an employee of one of the parties may serve on the jury.

2. **Defendants' closing argument**

Thompson next argues that he did not receive a fair trial because the defendants' attorney made improper comments during his closing argument. Specifically, Thompson claims it was improper for defendants' attorney to refer to Thompson as a "rich lawyer" when the defendants' attorney had copies of Thompson's tax returns (which indicated that he was not rich) and attended the foreclosure hearing involving Thompson's home. Thompson also claims it was improper for the defendants' attorney to suggest that Thompson had changed his appearance to prevent witnesses from recognizing him.

These isolated comments were not enough to render the trial unfair. The Court instructed the jury more than once that closing arguments are not evidence and that the jury's verdict should

7

be based on the evidence alone. Given this instruction, coupled with the insignificant nature of the comments in the context of the closing arguments, the Court is confident that the jury considered only evidence that was presented at trial. *See Ramsey v. American Air Filter, Co., Inc.*, 772 F.2d 1303, 1311 (7th Cir. 1985) ("[A] party's improper comments during closing arguments rarely rise to the level of reversible error.")

The cases that Thompson cites do not demand a different result. In *Joseph v. Brierton*, 739 F.2d 1244, 1247 (7th Cir. 1984), defense counsel inappropriately took advantage of a ruling barring plaintiff's counsel from mentioning that the defendants would be indemnified if found liable by extensively arguing that a judgment would financially ruin his clients. *Joseph* does not control the outcome of this case, because there was no *in limine* ruling preventing defendants from discussing Thompson's wealth, and the "rich lawyer" comment was far more isolated than the comments at issue in *Joseph*. Cases recognizing the impropriety of remarks concerning the *relative* wealth of the parties also do not control this case. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364 (3d Cir. 1999); *Adams Labs., Inc. v. Jacobs Eng'g*, 761 F.2d 1218, 1226 (7th Cir. 1985). Defendants' counsel made no such remarks during closing argument.

Thompson also maintains that the defendants' attorney's comments concerning Thompson's changed appearance violated the rule against referring to missing witnesses. "That rule permits an inference of unfavorable testimony from the missing witness, but only if that witness is peculiarly within the opposing party's power to produce." *Littlefield v. McGuffey*, 954 F.2d 1337, 1346 (7th Cir. 1992). Thompson did not object to evidence concerning his changed appearance, and though the argument might have sought an unsupported inferential leap, the comments were insignificant, even when considered together with the comment describing

8

Thompson as a "rich lawyer."

### 3. Weight of evidence on strip search claim

Finally, Thompson argues that the jury's verdict on Count 1, in which he alleged that the defendants subjected him to an unreasonable body cavity search, was against the manifest weight of the evidence. A court considering a motion for new trial may not set aside the jury's verdict "if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of the evidence to the jury." *Kapelanski v. Johnson,* 390 F.3d 525, 520 (7th Cir. 2004). "As long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict." *Robinson v. Burlington Northern R.R. Co.,* 131 F.3d 648, 656 (7th Cir. 1997).

On Count 1, the jury was instructed as follows:

> To succeed on this claim, Thompson must prove that he was concealing a weapon or contraband on his person. 'Reasonable suspicion' exists when a reasonably prudent person would be warranted, based on specific and articulable facts, in believing that the person being searched was concealing a weapon or contraband. In determining whether reasonable suspicion existed, you are to consider all of the circumstances that existed at the time.

*See* Jury Instructions at 16.

In *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), the Supreme Court held that jail officials do not violate the Fourth Amendment by strip searching pretrial detainees after contact visits. In the wake of *Bell*, however, a number of circuit courts, including the Seventh, have held that not all strip searches on pretrial detainees pass constitutional muster. Specifically, courts have held that

strip searches at the time of intake of a detainee accused of a minor offense violate the Fourth Amendment unless correctional officers have reasonable suspicion to believe that the detainee is concealing contraband. *See, e.g., Roberts v. Rhode Island*, 239 F.3d 107, 111 (1st Cir. 2001); *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001); *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983). These courts have recognized the particularly invasive nature of a strip search and have distinguished *Bell* by noting that *Bell* involved detainees charged with serious federal crimes and not individuals charged with misdemeanor or traffic offenses and that *Bell* involved strip searches after contact visits and not at intake. *See, e.g., Mary Beth G.*, 723 F.2d at 1272.

Thompson contends that there was no evidence at trial indicating that the defendants had reasonable suspicion to perform a strip search upon him. In response, defendants offer twenty-four supposed pieces of evidence which they contend support a finding of reasonable suspicion. Defendants' submission, however, subdivides the evidence into such microscopic portions as to render it nearly unrecognizable. Each of the multifarious bits of evidence cited by defendants can be classified in one of five categories: evidence that detainees have been observed in the holding areas holding contraband, passing contraband, and leaving contraband behind; evidence that Thompson knew the day before he was taken into custody that he would likely be going to jail; evidence that Thompson did not turn in his tie and wallet to booking officers; evidence that Sheriff's deputies had no way of knowing anything about Thompson's criminal background; and evidence indicating that, prior to the strip search, Thompson had contact with other detainees,

including individuals accused of violent and/or drug offenses.[1]

Defendants first argue that the jury could have found reasonable suspicion based on testimony that "[m]any detainees engage in conversations in all the holding cells and have been observed huddling together, squatting near each other, holding contraband, passing contraband, [and] leaving contraband in holding cells." *See* Def. Resp. at 11. In *Mary Beth G.*, the defendant offered similar non-specific testimony that a few items had been recovered from the body cavities of women arrested on minor charges as well as more specific testimony that in one study conducted over a thirty-five day period, contraband was found on women charged with offenses such as prostitution, assault, and drug possession. *Mary Beth G.*, 723 F.2d at 1272-73. The court held that the non-specific testimony, even in combination with the specific testimony, did not create a reasonable suspicion that minor offenders were concealing contraband. *Id.* at 1273. In this case, defendants offered only non-specific evidence that Sheriff's deputies have seen unspecified detainees exchanging contraband and that the deputies have recovered contraband in the holding cells. Defendants offered no historical evidence indicating that contraband was brought to the holding cells by anyone charged with minor offenses, let alone persons detained for civil contempt, which is not a crime at all. Consequently, as in *Mary Beth G.*, this evidence does not support a finding of reasonable suspicion.

Defendants next argue that Sheriff's deputies had reasonable suspicion to conduct the search because Thompson knew the day before he was taken into custody that he would likely be

---

[1] For instance, defendants' evidentiary points numbered 2, 3, 4, 5, 10, 11, and 18 all amount to a contention that Thompson was intermingled with other detainees while in custody prior to the strip search.

11

going to jail and because he did not turn in his tie and wallet to booking officers. Defendants offered no evidence, however, indicating that the Sheriff's deputies who conducted the strip search or any other sheriff's deputy or jail employee had any clue about this at the time Thompson was strip searched. Indeed, the evidence was essentially undisputed that defendants performed the strip search on *all* incoming detainees, without regard to their individual circumstances, backgrounds, or the reasons why each was being detained and without consideration of whether there was any information particular to the detainee indicating a suspicion he might possess contraband. For this reason, these facts cannot support a finding of reasonable suspicion. *See Kaniff v. United States*, 351 F.3d 780, 785 (7th Cir. 2003) (stating that district court properly determined whether reasonable suspicion was present by examining the facts known to the officer *at the time* of the search). *See generally Maryland v. Garrison*, 480 U.S. 79, 85 (1987) (holding that constitutionality of search must be judged "in light of the information available to [the officers] at the time they acted.").[2]

Defendants next argue that they showed reasonable suspicion existed by offering evidence that they had no record of Thompson's prior criminal history at the time of the search. Defendants have not explained nor cited cases for the somewhat remarkable proposition that the lack of information can create reasonable suspicion. The general rule promulgated by the Supreme Court is that to establish reasonable suspicion, police officers must be able to point to

---

[2] Defendants presented no evidence that at the time of the strip search any jail official had knowledge that Thompson knew he might be incarcerated the day before he was taken into custody or that Thompson failed to turn in his tie or wallet to booking officers. For this reason, defendants cannot rely on the collective knowledge doctrine to establish reasonable suspicion. *See United States v. Hensley*, 469 U.S. 221, 231 (1985) (holding that knowledge of one officer can be imputed to arresting officer when determining whether probable cause existed to arrest).

"specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Absent case law to the contrary, the Court declines to find that the absence of criminal history information – information that likely was available to the Sheriff and the County if they had taken the time to look for it – supports the finding of reasonable suspicion necessary to justify a strip search. Such a rule would encourage law enforcement officers and jailers to deliberately refrain from accessing detainees' criminal histories to justify strip searches in situations where they have been denounced as unconstitutional.

Defendants also contend that Sheriff's deputies had reasonable suspicion because Thompson was intermingled with the general jail population. The First, Second, Sixth, Ninth, and Tenth Circuits have rejected intermingling as a sole basis for finding the reasonable suspicion that supports strip searches on pretrial detainees. *See Roberts*, 239 F.3d at 113; *Chapman*, 989 F.2d at 396; *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1447 (9th Cir. 1989); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *Walsh v. Franco*, 849 F.2d 66, 69 (2d Cir. 1988). The defendants have not cited, and the Court has not found, any case holding otherwise.

Four of those five circuits – all but the Second – have stated that intermingling may be one non-determinative factor used to evaluate whether reasonable suspicion is present. The courts recognizing intermingling as a factor have not described what makes intermingling relevant in determining whether reasonable suspicion is present. One court has said that in evaluating reasonable suspicion, heavy reliance on intermingling is misplaced where such intermingling is both "limited and avoidable." *See Giles v. Ackerman*, 746 F.2d 614, 619 (9th

Cir. 1984). These courts also treat other factors, such as the offense charged, as much more significant in assessing whether reasonable suspicion is present. *See Thompson*, 885 F.2d at 1447 (finding reasonable suspicion where detainee charged with grand theft auto offense was intermingled with general population); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (finding no reasonable suspicion where detainee charged with traffic offenses was intermingled with general population).

This Court likewise does not believe that the Sheriff's decision to intermingle detainees held on serious criminal charges together with those who, like Thompson, are held not on any sort of criminal charge but rather as a coercive sanction for civil contempt can appropriately be a significant factor in the reasonable suspicion analysis, assuming that it is properly considered at all. Though we are cognizant that courts must accord prison and jail administrators deference in adopting and executing policies and practices needed to preserve order, discipline, and security, *see, e.g., Bell*, 441 U.S. at 547-48, defendants point to no evidence regarding the reasons for the Sheriff's decision to intermingle all detainees, criminal and civil, irrespective of the reasons why they are brought to the jail for intake. Thus there is no basis to support a determination that intermingling is based on anything more than considerations of administrative convenience. For these reasons, and because the decision to intermingle is entirely within the Sheriff's control, it would be inappropriate to give this factor significant, let alone controlling weight in the reasonable suspicion analysis. Were the law otherwise, a jailer could essentially create, at his discretion, a basis for blanket strip searches of detainees irrespective of the presence of individualized reasonable suspicion.

In sum, the evidence of intermingling in this case did not support the "particularized

14

suspicion" required to support such an invasive search. *See Chapman*, 989 F.2d at 398; *Walsh*, 849 F.2d at 69. Thompson was not charged with any crime, let alone one generally associated with violence or contraband, and there was no evidence that Sheriff's deputies noticed anything suspicious about him which would have otherwise justified the search.

The only other evidence that defendants cite to support the jury's determination of reasonable suspicion was the non-specific and unquantified testimony that contraband has been found in the jail's holding cells. This adds nothing to the intermingling argument – indeed, it is logically part of that same contention – and it does not support the jury's verdict.

The Court recognizes that it must consider the evidence cited by the defendant sin support of a finding of reasonable suspicion as a whole, not as separate and unconnected bits of evidence. *See United States. v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000) (court should look to the record as a whole to determine whether reasonable suspicion is present). But even when we do so, the manifest weight of the evidence was contrary to the jury's verdict. *See Roberts*, 239 F.3d at 112 (holding that non-specific evidence that the jail had problems with contraband together with evidence of intermingling was not enough to support a finding of reasonable suspicion).

Finally, defendants maintain that a jury could have concluded that a search never occurred because there was some evidence that Sheriff's deputies never actually looked into Thompson's rectum. But defendants do not dispute that Thompson was strip searched. The fact that Sheriff's deputies may not have examined Thompson's rectum does not alter the Court's Fourth Amendment analysis. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1043 (7th Cir. 1995) (requiring reasonable suspicion for strip search); *Mary Beth G.*, 723 F.2d at 1273 (requiring

reasonable suspicion for visual body cavity search).

## Conclusion

For the reasons stated above, the Court grants Thompson's motion for a new trial as it concerns Count 1 but denies the motion as it concerns Counts 2 and 3 [docket no. 113]. The case is set for a status hearing on April 27, 2006 at 9:30 a.m. for the purpose of setting a date for the retrial of Count 1. Trial counsel are directed to appear.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 18, 2006